_____

No. 95-2238
_____

First Bank,                              *
                                         *
          Appellant,                     *
                                         *  Appeal from the United States
      v.                                 *  District Court for the
                                         *  Southern District of Iowa.
First Bank System, Inc.; and             *
First Bank, fsb, formerly known          *
as Metropolitan Federal Bank,            *
fsb,                                     *
                                         *
          Appellees.                     *

_____

          Submitted:  December 13, 1995

             Filed:  May 29, 1996
_____

Before McMILLIAN, JOHN R. GIBSON, and BEAM, Circuit Judges.
_____

BEAM, Circuit Judge.


     First Bank (FB) appeals the district court's[1] order dissolving a
preliminary injunction and denying its motion for a permanent injunction
against the use of FIRST BANK, FIRST BANK IOWA, or any colorable imitations
of those terms by First Bank System, Inc. (FBS).[2]  Because FB failed to
prove the facts essential to establish a common-law trademark, we affirm.


_____

     [1]The Honorable Charles R. Wolle, Chief Judge, United States
District Court for the Southern District of Iowa.

     [2]For ease of reference, we refer to the plaintiff-appellant as
"FB" and defendants-appellees as "FBS" throughout this opinion,
while recognizing that the entities have undergone name changes and
consolidation in the past.

## I.  BACKGROUND

This case involves a dispute between two banks over the use of FIRST BANK in connection with banking services provided in the Iowa counties of Polk, Dallas, and Warren.  One of these banks, FBS, is a federally chartered bank holding company with its principal place of business in Minneapolis, Minnesota.  FBS owns banks in several states and provides banking services throughout the United States.  Since the early 1970s, FBS has provided various banking services in Iowa--such as home improvement loans, correspondent banking, commercial lending, and credit cards--even though FBS did not have an office in Iowa.  Rather, FBS promoted and provided its services through advertising, personal contacts and the mail.

As part of its acquisition of Metropolitan Federal Bank, fsb, in late 1994, FBS obtained several branches in Iowa.  On February 18, 1995, Metropolitan Federal Bank, fsb, changed its legal name to First Bank, fsb. The former Metropolitan Federal Banks in Iowa were renamed First Bank Iowa. FBS has owned several trademark registrations, including:  (1) an Iowa registration on FIRST BANK SYSTEMS from 1968 to 1978; (2) an Iowa registration on FIRST BANK and a design from 1968 to 1978; (3) a federal registration for FIRST BANK SYSTEM and a design from 1971 to 1991; (4) a federal registration for FIRST BANK SYSTEM issued December 26, 1989, asserting first use on August 26, 1968; (5) a federal registration for FIRST BANKS and a design issued June 21, 1994, asserting first use on October 4, 1991; and (6) an Iowa service mark application for FIRST BANK filed November 14, 1986, claiming use in Iowa on October 1979.

The other bank, FB, is an Iowa chartered bank with its principal place of business in West Des Moines, Iowa.  Prior to 1993, FB was a federally chartered bank.  From 1938 to 1993, FB was known as First National Bank of West Des Moines.  FB has never owned a registered trademark for FIRST BANK.  FB relies instead on

the common law of trademarks for its claim of an exclusive right to use FIRST BANK in connection with banking services provided in these counties.

Beginning in 1970, FB used a logo which combined a prominent Arabic numeral "1" with the phrase "FIRST NATIONAL BANK OF WEST DES MOINES" (1970 logo). In order to compete more effectively with a rival bank in West Des Moines commonly referred to as "West Bank," FB emphasized the words "FIRST" and "BANK" in this logo by printing those two words in larger letters. The word "NATIONAL" remained on the logo in smaller print, as did the phrase "OF WEST DES MOINES," until a modernized version of the logo appeared in December of 1985 (1985 logo). FB printed the 1970 logo on various items--including checks, stationary, envelopes, and business cards--and used it in advertisements. In 1970, FB had over 1700 customers in Iowa. Rex Weitzell, FB's advertising agent in the 1970s, testified that he referred to the bank as "First Bank" during his tenure with the bank. William Fultz, an advertising agent, also testified that he referred to FB as "First Bank" in the early 1970s while he was doing work for Bankers Trust. Roy Messerschmidt, Chairman of FB, testified that FB has identified itself as "First Bank" when it answers the telephone since 1970.

Thomas Porter, FB's advertising agent, testified that he was under the impression that in 1985 people were referring to FB as "First Bank." Nevertheless, in 1985, he suggested that the officers and board of FB make a concerted effort to change the bank's name to "First Bank." Porter testified that the primary reason the bank should change its name was to preempt FBS from using FIRST BANK in Iowa. Porter was aware of ongoing efforts by FBS to acquire a chain of banks in Iowa. Before adopting the name change and new logo, FB consulted with G. Brian Pingel, Esq., a trademark attorney. In a letter dated October 4, 1985, Pingel advised FB to begin using FIRST BANK as soon as possible, but he warned FB about several potential conflicts, including the existing

FBS federal trademark registration for FIRST BANK SYSTEM.  In that letter, Pingel repeatedly referred to FB as "First National" rather than "First Bank."

Throughout the early 1980s, FB continued to attach its 1970 logo to bank documents and used those logos in various promotional materials. Advertisements printed during the 1980s, however, contained quotations in which satisfied customers referred to FB as "First National" not as "First Bank."  In an effort to further emphasize the "First Bank" concept and facilitate its attempted name change, FB used the 1985 logo, which only contained the Arabic numeral "1" and the two words "FIRST BANK" in advertisements and on bank documents (e.g., checks, and stationery).[3] Finally, on December 22, 1993, FB changed its legal name to "First Bank."

In July 1994, FB heard that FBS was in the process of acquiring Metropolitan Federal Bank branches in Iowa, some of which were in FB's primary market area of Polk, Dallas, and Warren counties.  Counsel for FB contacted FBS and expressed concern over FBS's possible use of FIRST BANK in connection with banking services provided in FB's primary market area. FBS did not respond to FB's concerns until three days before FB filed the complaint in the present case on January 12, 1995.  FB claimed that it had the exclusive right to use FIRST BANK in connection with banking services it provided in its primary market area and alleged that FBS violated both federal and Iowa trademark laws.  The district court denied a temporary restraining order but subsequently granted FB a preliminary injunction on February 1, 1995.

FB requested a permanent injunction to prohibit FBS from using FIRST BANK or any colorable imitation in FB's primary market area.

---

[3]In fact, FB was required to print the 1985 logo in combination with "FIRST NATIONAL BANK OF WEST DES MOINES" until it became a state chartered bank in 1993.  Subsequently, FB printed the 1985 logo with other phrases, such as "THE BANK DES MOINES CALLS FIRST."

After conducting the first part of a bifurcated trial, the district court dissolved the preliminary injunction and denied the request for a permanent injunction.  In an order dated April 19, 1995, the district court held, inter alia, that:  (1) FB had failed to prove that it had used the name "First Bank," rather than "First National," prior to 1971 when FBS registered its federal trademark for FIRST BANK SYSTEM; and (2) the words "First Bank" did not have a secondary meaning referring to FB until after 1986, which was well after those same words had acquired a secondary meaning in Iowa referring to FBS in connection with banking services it provided in Iowa by mail from outside the state.  The district court also determined that equitable considerations favored denying the permanent injunction.

FB appeals pursuant to 28 U.S.C. § 1292(a), claiming that the district court committed several errors in its findings of fact and conclusions of law.  Specifically, FB contends that it already had a common-law trademark in FIRST BANK, based primarily on FB's extensive use of its 1970 logo, prior to FBS's 1971 federal trademark registration.  FB also argues that the district court erred in holding that actual confusion is insufficient to establish trademark infringement.  Finally, FB asserts that it was error for the district court to conclude that FB's adoption of FIRST BANK was in bad faith.

**II.  DISCUSSION**

The narrow question before us is whether the district court erred in denying FB's motion for a permanent injunction.  We review a district court's denial of a motion for a permanent injunction under the abuse of discretion standard.  International Ass'n of Machinists & Aerospace Workers, Dist. Lodge No. 19 v. Soo Line R.R. Co., 850 F.2d 368, 374 (8th Cir. 1988), cert. denied, 489 U.S. 1010 (1989).  An abuse of discretion occurs when the district court bases its decision on an error of law or a clearly erroneous

finding of fact.  Id.  Although FB raises several issues on appeal, our inquiry focuses on the dispositive issue of whether the district court was clearly erroneous in finding that FIRST BANK had not achieved distinctiveness, or secondary meaning, in connection with FB's banking services prior to FBS's federal trademark registration or use of its FIRST BANK SYSTEM mark.  For the reasons discussed below, we agree with the district court that FB failed to prove that FIRST BANK acquired secondary meaning prior to 1986 and thus FB's injunction action fails.

In asserting the exclusive right to use FIRST BANK in connection with banking services in the relevant Iowa counties, FB has not claimed that it possesses a registered trademark, which would have been prima facie evidence of a valid trademark.  15 U.S.C. § 1115(a).  Therefore, FB must rely on the existence of a common-law trademark in bringing this lawsuit.  Moreover, because FB claims exclusive use of FIRST BANK in the three Iowa counties, it must prove that it had a common-law trademark prior to FBS's registration or use of its FIRST BANK SYSTEM mark.  See Wrist-Rocket Mfg. Co., Inc. v. Saunders Archery Co., 578 F.2d 727, 730 (8th Cir. 1978) (recognizing that while a registered trademark owner's rights can become incontestible, other common-law trademark owners retain exclusive rights in those areas where their rights antedated registration).  In contrast, registration of the FBS mark established prima facie evidence of a valid trademark and provided nationwide constructive notice of that mark, see 15 U.S.C. §§ 1072 & 1115(a); Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co., 477 F.2d 150, 156 (6th Cir. 1973), or any colorable imitations such as FIRST BANK or FIRST BANK IOWA, see 15 U.S.C. §§ 1114(1) & 1127.  Thus, FB can only prohibit the use of FIRST BANK SYSTEM, or any colorable imitation, in its market area if it meets three requirements.  First, FB must prove that it had a common-law trademark in FIRST BANK antedating registration of FBS's mark.  Second, FB must prove that its common-law mark is similar enough to FBS's mark to create a substantial likelihood of confusion among

consumers. <u>See</u> 15 U.S.C. §§ 1114(1) & 1125(a)(1)(A). Third, FB must demonstrate that the court's exercise of equitable power is appropriate. <u>See</u> 15 U.S.C. § 1116.

Turning to the first requirement, a common-law trademark arises from the adoption and actual use of a word, phrase, logo, or other device to identify goods or services with a particular party. <u>See</u>, <u>e.g.</u>, <u>Co-Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.</u>, 780 F.2d 1324, 1329 (8th Cir. 1985) (quoting the statutory definition set out in 15 U.S.C. § 1127); 3 Rudolf Callmann, <u>The Law of Unfair Competition, Trademarks and Monopolies</u> § 19.01, at 19-3 (4th ed. 1994).[4] To succeed on its claim of a common-law trademark, therefore, FB must prove: (1) that it actually used FIRST BANK in connection with banking services provided in the relevant Iowa counties; and (2) that FIRST BANK identified FB as the provider of those services in the minds of consumers.

Assuming, <u>arguendo</u>, that FB actually used FIRST BANK in connection with banking services provided in the relevant Iowa counties prior to FBS obtaining its federal registration, FB must prove that consumers (i.e., its customers and potential customers) identified FIRST BANK with FB as the provider of those banking services in these counties prior to FBS obtaining its federally registered mark. In order to qualify for trademark protection, therefore, FIRST BANK must <u>distinctly</u> identify FB as the provider of certain banking services in the minds of consumers. We begin our inquiry as to whether FIRST BANK is sufficiently distinct to achieve this by classifying it into one of four categories: (1)

---

[4]The Restatement (Third) of the Law of Unfair Competition § 9 (1995) defines a trademark as "a word, name, symbol, device, or other designation, or a combination of such designations, that is distinctive of a person's goods or services and that is used in a manner that identifies those goods or services and distinguishes them from the goods or services of others."

generic; (2) descriptive; (3) suggestive;[5] or (4) arbitrary or fanciful. See Cellular Sales, Inc. v. Mackay, 942 F.2d 483, 485 (8th Cir. 1991). Generic terms are not entitled to protection under trademark law because "such words are in `the public domain and available for all to use[.]'" Id. at 486 (quoting Hallmark Cards, Inc. v. Hallmark Dodge, Inc., 634 F. Supp. 990, 997 (W.D. Mo. 1986)). At the other end of the spectrum, we consider an arbitrary or fanciful mark the strongest possible trademark, thus entitling it to the maximum degree of legal protection without requiring any proof of secondary meaning. Id. A descriptive trademark is the weakest protectable mark and requires proof that the mark has acquired secondary meaning. Id.

A trademark user establishes secondary meaning by showing that through "long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others." Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 870 (8th Cir. 1994) (citing Co-Rect Prods., Inc., 780 F.2d at 1330). The primary inquiry in determining whether the mark has attained secondary meaning is whether the mark has become associated with a particular source in the consumer's mind. Id. at 871 (citing Co-Rect Prods., Inc., 780 F.2d at 1332-33); First Fed. Sav. & Loan Ass'n of Council Bluffs v. First Fed. Sav. & Loan Ass'n of Lincoln, 929 F.2d 382, 384 (8th Cir. 1991) (A descriptive term only becomes protectable under trademark law "when it conjures up a particular service or product in the minds of customers.").

---

[5]A mark that suggests some quality or ingredient constitutes a suggestive trademark, which is entitled to trademark protection without proving secondary meaning. See 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11.20, at 11-104.4 (3d ed. 1996).

In the present case, FB concedes that FIRST BANK is a descriptive term and thus is not inherently distinctive. FB contends, however, that FIRST BANK acquired secondary meaning, thereby identifying the mark with banking services provided by FB in the relevant Iowa counties. To support its contention, FB offered testimony by the creator of the 1970 logo, advertising agent Jim Bowermaster, that the advertising campaign in late 1969 and early 1970, along with the 1970 logo, was to establish the concept of "First Bank."[6] Roy Messerschmidt, Chairman of FB, testified that the 1970 logo was used on all of the bank's documents. He also testified that he thought, for the most part, that FB started answering the telephone "First Bank" in 1970. As noted earlier, advertising agent, Thomas Porter, testified that he was under the impression that people were referring to FB as "First Bank" in 1985. FB also argues that in addition to wide-spread dissemination of the 1970 logo, FB had substantial accounts in these counties prior to 1971.

This type of evidence simply fails to establish sufficient proof that <u>consumers</u> identified FIRST BANK with the services provided by FB, which is the focus of our secondary meaning analysis. FB's evidence of secondary meaning consisted almost exclusively of efforts undertaken by the bank to identify itself as FIRST BANK prior to 1971. Although relevant, FB's efforts are not determinative of whether consumers actually identified FIRST BANK with FB. See <u>Co-Rect Prods., Inc.</u>, 780 F.2d at 1332 (stating that while "advertising is a relevant factor in determining whether a mark has acquired a secondary meaning, it is the <u>effect</u> of such advertising that is important, not its extent") (emphasis in original); <u>Wrist-Rocket Mfg. Co.</u>, 578 F.2d at 732 (stating that "common-law trademark rights cannot be established by advertising

---

[6]Some of the testimony took place only at the preliminary injunction hearing (e.g., Bowermaster's testimony). Other testimony occurred during the first part of the bifurcated trial, or at both proceedings.

alone"); Charles E. McKenney & George F. Long, III, <u>Federal Unfair Competition: Lanham Act § 43(a)</u> § 3.05, at 3-53 (1995) ("Evidence of advertising and extent of use of the mark in controversy are obviously important factors but are not determinative, such proofs demonstrating a party's efforts to establish secondary meaning but not necessarily demonstrating that such efforts were in fact successful.") (footnotes omitted). FB's failure to identify itself with FIRST BANK in the minds of consumers was further highlighted by William Fultz, FB's own expert witness on advertising who testified, on cross-examination, that it takes a long time for a business to establish an identity with a particular logo or slogan. He admitted that FB probably had not yet been successful in identifying itself as "First Bank" in the mid-1980s, given that customers had consistently referred to FB as "First National" in its advertisements.

Furthermore, the record reflects that FB never actually used the words "First" and "Bank" consecutively in any document, advertisement, or other printed medium prior to 1985, when it began to develop the 1985 logo. Moreover, Pingel, FB's own trademark attorney, consistently referred to FB as "First National" in his letter of October 4, 1985, in which he recommended adopting and using FIRST BANK as soon as possible. Roy Messerschmidt also recommended to FB's board of directors that it should start using FIRST BANK in the mid-1980s. Finally, the record is replete with examples of FB customers referring to FB as "First National" rather than "First Bank" throughout the 1980s.[7]

---

[7]Although FB theoretically could obtain two common-law trademarks (i.e., FIRST BANK and FIRST NATIONAL), the absence of any customer reference to FB as "First Bank" in its advertisements supports the district court's conclusion that FB failed to prove that FIRST BANK had acquired secondary meaning identifying FB as the provider of certain banking services in the three Iowa counties until after 1986.

FB asserts that Pingel's references to FB as "First National" and recommendation that FB start using FIRST BANK, as well as Porter's recommendation that FB change its name to "First Bank" in order to preempt FBS from using FIRST BANK in Iowa, should not have been given any weight by the district court because neither man knew that FB had used FIRST BANK in the past.  At a minimum, however, the fact that neither of the two men hired by FB to promote it as FIRST BANK (i.e., its trademark lawyer and advertising agent) were aware that FB had attempted to identify itself with FIRST BANK in the past provides some indication of the success FB was experiencing in its effort to be recognized as "First Bank."

When evidence on the issue of secondary meaning is, at best, conflicting, as in the present case, we will not disturb the district court's factual finding unless upon reviewing the entire record we are left with the definite conviction that the lower court made a mistake. Aromatique, 28 F.3d at 868; see also First Fed. Sav. & Loan of Council Bluffs, 929 F.2d at 384 (holding that the district court was not clearly erroneous in finding that the term "First Federal" was a descriptive mark); G.H. Mumm & Cie v. Desnoes & Geddes, Ltd., 917 F.2d 1292, 1294 (Fed. Cir. 1990) (stating that a determination of secondary meaning is a question of fact which is reviewed on appeal under the clearly erroneous standard). Applying this standard, we conclude that the district court did not commit clear error.  We agree with the district court that FB failed to prove that FIRST BANK had attained secondary meaning before 1986, which is well after FBS registered its FIRST BANK SYSTEM trademark in 1971.[8]

_____

[8]Even if FB were able to rebut the statutorily prescribed presumption that FBS owned a valid trademark dating from its registration in 1971, see 15 U.S.C. § 1115(a), the district court also found that FBS actually used and acquired secondary meaning in FIRST BANK SYSTEM in the relevant Iowa counties, thereby establishing a common-law trademark, before FB established a common-law trademark in FIRST BANK.

## III. CONCLUSION

The district court did not commit clear error in finding that FB failed to prove the facts necessary to establish a common-law trademark that antedated FBS's registration of its mark and thus FB was not entitled to the exclusive use of FIRST BANK in these counties.[9] Moreover, we have examined the equitable considerations presented in this case and conclude that the district court did not abuse its discretion in denying the permanent injunction. Accordingly, we affirm the district court's order. Finally, we have considered the other arguments advanced by FB and find them to be without merit.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[9] Because we conclude that FB failed to prove that FIRST BANK was distinctive (i.e., that it had acquired secondary meaning) prior to FBS's registration or use of FIRST BANK SYSTEM--which is fatal to FB's claim--we need not discuss any other factual requirement necessary to establish a common-law trademark. Likewise, because FB failed to prove that it had a common-law trademark we need not determine whether FIRST BANK and FIRST BANK SYSTEM or FIRST BANK IOWA are similar enough to create a likelihood of confusion among customers.